UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00145-GNS-LLK

JESSICA REHBOCK for C.N.R. (a minor)                                        PLAINTIFF

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security                                            DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court on Plaintiff's Objection to the Magistrate Judge's Report

and Recommendation (DN 25).   For the reasons stated below, Plaintiff's Objection is

**OVERRULED**, the Magistrate Judge's Findings of Fact, Conclusions of Law, and

Recommendation ("R&R") (DN 22), is **ADOPTED** to the extent it is not inconsistent with this

opinion, and Plaintiff's Complaint (DN 1) is **DISMISSED WITH PREJUDICE**.

## I.      BACKGROUND

### A.      Childhood Disability

In 2012, Plaintiff Jessica Rehbock ("Plaintiff") applied for supplemental security income

and any state supplementation and applicable medical assistance on behalf of her minor child,

C.N.R.  (Administrative R. at 141-46, DN 14 [hereinafter R.]).  A child under age eighteen is

disabled if he "has a medically determinable physical or mental impairment, which results in

marked and severe functional limitations, and which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 1382c(a)(3)(C)(i).  C.N.R. is diagnosed with attention deficit hyperactivity disorder

("ADHD"), Asperger's syndrome, and a language disorder.  (R. at 17-18).

On June 25, 2015, C.N.R. and Plaintiff participated in a hearing before Administrative Law Judge Mary S. Lassy ("ALJ"). (R. at 31-53). The ALJ denied the claim, reasoning that C.N.R. had not been under a disability from December 13, 2012, through July 31, 2015, the date of the decision. (R. at 11-30).

**B.     ALJ's Decision**

In reaching her decision, the ALJ evaluated Plaintiff's application under the three-step sequential evaluation process promulgated by the Commissioner. (R. at 14-26). First, the ALJ found that C.N.R. had not engaged in substantial gainful activity since December 13, 2012, the date the application was protectively filed. (R. at 17). Second, the ALJ determined that C.N.R.'s ADHD, autistic disorder, and language disorder were "severe" impairments within the meaning of the regulations. (R. at 17).

The third step, at issue here, probed whether the claimant had an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. at 17). A finding of functional equivalence is required if the claimant's impairments cause an "extreme"[1] limitation in one area or a "marked"[2] limitation in two or more areas. 20 C.F.R. §

---

[1] The applicable regulation defines an "extreme" limitation as one that:

> interferes very seriously with [one's] ability to independently initiate, sustain, or complete activities. . . . "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i). The regulation further provides:

> If you are a child of any age (birth to attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test

416.926a(a). Six functional equivalence domains ("Domains") are considered in this step in the evaluation: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; (6) and health and physical well-being. 20 C.F.R. § 416.926a(b)(1). The ALJ found, *inter alia*, that:

- Acquiring and Using Information (Domain 1): Notwithstanding that he had repeated kindergarten and was therefore one grade level behind his age group, C.N.R. had "no overly remarkable deficits in his intellectual functioning." (R. at 19). An evaluation by a psychological consultative examiner, Dr. Amble, demonstrated he had normal intelligence and an IQ score of 94. (R. at 19). An evaluation on October 24, 2013, by a school psychologist concluded C.N.R. had

---

designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

*Id.* § 416.926a(c)(3)(iii). This subsection is also cross-referenced with Section 416.926a(e)(4), discussed below.

[2] The applicable regulation defines a "marked" limitation as one that:

interferes seriously with [one's] ability to independently initiate, sustain, or complete activities. . . . "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i). The regulation further provides:

[I]f you are a child of any age (birth to the attainment of age 18), we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score."

*Id.* § 416.926a(e)(2)(iii). This subsection is also cross-referenced with Section 416.926a(e)(4), discussed below.

overall cognitive functioning, basic reading, and math computation skills within the average range. (R. at 19). C.N.R. had minimal symptoms of autism spectrum disorder based on a rating scale completed by his special education teacher. (R. at 19-20). C.N.R.'s teacher questionnaires completed on May 16, 2013, September 25, 2013, and May 17, 2015, reflected no serious problems. (R. at 20).

- o Conclusion: C.N.R. had less than marked limitation in Domain 1. (R. at 19)

- Attending and Completing Tasks (Domain 2): C.N.R.'s ADHD was "sufficiently controlled with medication," per treatment notes dated November 6, 2012, January 7, 2013, April 8, 2013, and June 11, 2013. (R. at 21). A teacher questionnaire suggested C.N.R. had "extremely serious problems working at a reasonable pace or finishing on time[,]" but that C.N.R. had "only slight problems completing class and homework assignments, carrying out multi-step instructions, and refocusing to task when necessary." (R. at 21). Additional teacher questionnaires reflected no serious problems in this area, and C.N.R.'s impairments did not cause a recent spike in absences at school.

- o Conclusion: C.N.R. had less than marked limitation in Domain 2. (R. at 21).

- Interacting and Relating with Others (Domain 3): the ALJ observed that C.N.R. had some degree of language disorder, but the same was described as "moderate" as of a September 13, 2013 speech questionnaire. (R. at 22). C.N.R.'s progress and prognosis in speech/language therapy were both good. (R. at 22). An evaluation by a speech/language therapist judged C.N.R.'s speech to be

intelligible to the unfamiliar listener with 90% accuracy, and that his voice and fluency skills were within normal limits. (R. at 22). A behavior modification in place at school set goals for C.N.R.'s responsiveness, and a reward system was in place to keep him focused. (R. at 22-23).

- o Conclusion: C.N.R. had less than marked limitation in Domain 3. (R. at 22).

- Moving About and Manipulating Objects (Domain 4): The record indicated no significant difficulties related to C.N.R.'s strength, coordination, or motor skills, and a report prepared by his mother reflected no limitations of his physical abilities. (R. at 23-24).

- o Conclusion: C.N.R. had no limitation in Domain 4. (R. at 23).

- Caring for Yourself (Domain 5): Notwithstanding C.N.R.'s requiring some assistance in this area, C.N.R. was able to attend public school, engage in activities including video games and swimming, and was responsible with his eyeglasses. (R. at 25).

- o Conclusion: C.N.R. had less than marked limitation in Domain 5. (R. at 25).

- Health and Physical Well-Being (Domain 6): The record indicated no significantly adverse side effects from C.N.R.'s prescribed medication, which was noted to be working well for him. (R. at 25).

- o Conclusion: C.N.R. had no limitation in Domain 6. (R. at 25).

The ALJ further noted that she gave "great weight to the assessments endorsed by the state agency consultants . . . which found the claimant to have no more than less than marked

limitations[,]" as they were "reasonably commensurate with and supported by the overall substantial evidence of record" relied upon in the individual domains of functioning.  (R. at 26, 54-62, 64-76).  The ALJ also accorded "[g]reat weight . . . to the various teacher questionnaires of record to the extent they do not disagree with" her findings of fact.  (R. at 26).  The most recent questionnaires were completed in May 2015, and were tailored to the functional equivalence categories.[3]  (R. at 228-47).

---

[3]  Rating options for the questionnaires were:  1) no problem; 2) a slight problem; 3) a serious problem; or 4) a very serious problem.  (R. at 228-47).

In Domain 1 (Acquiring and Using Information), both teachers agreed that C.N.R. had a serious problem with comprehending oral instructions and expressing ideas in written form; his science teacher felt he also had a serious problem with applying problem-solving skills in class discussions, which his reading teacher rated as only a slight problem; his reading teacher felt he had a serious problem with providing organized oral explanations and adequate descriptions, which his science teacher rated only a slight problem.  Both teachers agreed he did not have a very serious problem in any of the ten sub-categories.

In Domain 2 (Attending and Completing Tasks), both teachers agreed that C.N.R. had at least a serious problem with working at a reasonable pace/finishing on time, which his science teacher rated as an extremely serious problem; both agreed he had a serious problem with paying attention when spoken to directly; his science teacher felt he had a serious problem with focusing long enough to finish an assigned activity or task, which his reading teacher felt was only a slight problem; his reading teacher felt he had a serious problem with carrying out multi-step instructions, which his science teacher rated only a slight problem.

In Domain 3 (Interacting and Relating with Others), both teachers agreed that C.N.R. had a serious problem with playing cooperatively with other children; his science teacher felt that he also had a serious problem with interpreting the meaning of facial expression, body language, hints, sarcasm, which his reading teacher felt was only a slight problem; his reading teacher also rated relating experiences and telling stories as a serious problem, which his science teacher felt was only a slight problem.  Both teachers agreed he did not have an extremely serious problem in any of the thirteen sub-categories.

In Domain 4 (Moving About and Manipulating Objects), only C.N.R.'s reading teacher felt he had any problems: a serious problem with managing pace of physical activities or tasks, and slight problems with demonstrating strength, coordination, dexterity in activities or tasks, and integrating sensory input with motor output, with no problems in the remaining four sub-categories.  She commented that C.N.R.'s movements were "rigid rather than fluid."  His science

Finally, the ALJ discussed the various global assessment of functioning (GAF) ratings provided. (R. at 26). She granted "limited weight" to the rating of Dr. Amble, finding that it was "not entirely consistent with the recent medical evidence as a whole" and additionally found that the ratings in the record from Four Rivers Behavioral Health were not afforded "significant weight" as not "endorsed by an acceptable source to give a medical opinion." (R. at 26).

Thus, since C.N.R. did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, the ALJ determined that C.N.R. had not been disabled, as defined by the Social Security Act, since the filing date of his application. (R. at 26). Plaintiff filed a request for review, which the Appeals Council denied. (R. at 1-5, 9-10).

### C. Plaintiff's Federal Claim

Plaintiff filed suit in this Court seeking judicial review of the Commissioner's final decision. (Compl., DN 1). Following the filing of the administrative record and fact and law summaries from each party Magistrate Judge King submitted his R&R recommending that the final decision of the Commissioner be affirmed. (R. & R. 1, 6).

Plaintiff objected to the R&R, and the Commissioner responded. (Pl.'s Obj., DN 25; Def.'s Resp. Pl.'s Obj., DN 26). This matter is ripe for adjudication.

---

teacher selected the option for "NO problems observed in this domain; functioning appears age-appropriate."

In Domain 5 (Caring for Himself or Herself), only C.N.R.'s reading teacher felt he had any problems, and no serious or extremely serious ones, while his science teacher felt he had no problems/age-appropriate functioning.

Magistrate Judge King noted in the R&R that the teachers' responses "amply supported the ALJ's finding that Plaintiff does not have a 'marked' limitation in any functional domain." (R. & R. 3).

## II.    JURISDICTION

The Court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter judgment affirming, modifying, or reversing that decision.  *See* 42 U.S.C. § 405(g).

## III.    STANDARD OF REVIEW

The parts of a Magistrate Judge's R&R to which objections are raised are reviewed by the district judge *de novo*, and the Court may accept, reject, or modify, in whole or in part, the R&R. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  This differs from the standard applied to the Commissioner's decision.  That decision, rendered by an ALJ, is reviewed to determine "whether it is supported by substantial evidence and was made pursuant to proper legal standards."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citations omitted).  Where substantial evidence supports the ALJ's decision, a court is obliged to affirm.  *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (citation omitted).  A court should not attempt to second-guess the factfinder with respect to conflicts of evidence or questions of credibility. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted).

## IV.    DISCUSSION

The Magistrate Judge recommended that the final decision of the Commissioner, via the ALJ's decision, be affirmed and Plaintiff's Complaint be dismissed.  (R. & R. 6).  The Court agrees with the Magistrate Judge.  Plaintiff raises the following issues in the Objection to the R&R:  (1) the Magistrate Judge incorrectly found no error regarding the ALJ's reliance on non-examining state agency opinions; (2) the Magistrate Judge incorrectly found no error in the ALJ's conclusions relating to C.N.R.'s impairments; and (3) the Magistrate Judge disregarded

the ALJ's failure to follow required legal standards, including due process. These objections are addressed in turn.

### A. <u>State Agency Opinions</u>

The ALJ gave "great weight to the assessments endorsed by the state agency consultants . . . which found the claimant to have no more than less than marked limitations[,]" as they were "reasonably commensurate with and supported by the overall substantial evidence of record" relied upon in the individual domains of functioning. (R. at 26, 54-62, 64-76). Plaintiff objects that the "stale and uninformed" assessments "were based upon a woefully incomplete record" and that the ALJ failed to comply with the Commissioner's regulations in addressing C.N.R.'s objective test scores. (Pl.'s Obj. 5-6).

#### 1. *Record Available to Assessments*

Plaintiff's argument is meritless, given both the extensive record available to the state agency consultants at the time of the assessments, as well as the ALJ's demonstrable reliance on additional evidence from the record. The first of these assessments, from C.N.R.'s initial claim for disability, was based on evidence from a number of sources:

- Bruce Amble ("Dr. Amble"), Ph.D., a consulting psychologist, who examined C.N.R. at the request of the Commissioner in March 2013. (R. at 55-56, 308-14). Dr. Amble's report included his findings that C.N.R. had a low normal IQ of 94, a GAF of 51, and his reported ADHD and autism/Asperger's syndrome diagnoses were consistent with Dr. Amble's impression of C.N.R. during the assessment. (R. at 312).

- Records from C.N.R.'s treating physician, Joseph D. Wiggins ("Dr. Wiggins"), M.D., which evidenced C.N.R.'s ADHD diagnosis and ongoing medication for the same. (R. at 58, 285-304).

- A teacher questionnaire from May 16, 2013 by C.N.R.'s math and language arts teacher which reported C.N.R. had an obvious problem[4] in two[5] of ten sub-categories in Domain 1 (Acquiring and Using Information), and a slight or no problem in the remaining eight sub-categories; an obvious problem in one[6] of thirteen sub-categories in Domain 2 (Attending and Completing Tasks), and a slight or no problem in the remaining twelve sub-categories; an obvious problem in one[7] of thirteen sub-categories in Domain 3 (Interacting and Relating With Others), and a slight or no problem in the remaining twelve sub-categories; no problems in Domain 4 (Moving About and Manipulating Objects); and slight or no problems in all ten sub-categories in Doman 5 (Caring for Himself or Herself). (R. at 169-77).

- A request for administrative information, completed by Mayfield Elementary School on May 13, 2013, that reflected C.N.R.'s current instructional levels (third grade), standardized assessment scores (Apprentice in Reading and Proficient in Math, per his April 2012 state testing results), educational disabilities ("Speech or Language Impairment" and "Autism"), and placement in Special Ed. Instruction

---

[4] A different rating scale was used in this teacher questionnaire than in those performed in May 2015. The options for this rating scale were: (1) no problem; (2) a slight problem; (3) an obvious problem; (4) a serious problem; or (5) a very serious problem. (R. at 169-77).
[5] The obvious problems were in understanding and participating in class discussions, and providing organized oral explanations and adequate descriptions. (R. at 171).
[6] The obvious problem identified was waiting to take turns. (R. at 172).
[7] The obvious problem was seeking attention appropriately. (R. at 173).

Resource Room for 1.25 hrs./week and Speech-Language Therapy for 0.5 hrs./week.  (R. at 320-22).

- Speech questionnaires from January 9, 2013, and May 10, 2013, completed by the school M.S./CCC-SLP[8] at Mayfield Elementary School, and reflected C.N.R.'s ongoing language therapy for "deficits with language involv[ing] his social language skills" as well as "[f]igurative & abstract lang[uage] . . . ."  (R. at 305-07, 317-19).

- A function report for a child age 6-12, submitted with C.N.R.'s initial application for benefits, reflecting his mother's impressions that C.N.R. had "problems talking clearly," being understood both by people who knew him and didn't know him well, was incapable of completing three[9] of the seven tasks identified with limited ability to communicate, was incapable of completing three[10] of the 14 tasks identified with limited ability to progress in learning, was incapable of completing three[11] of the five tasks identified with an impairment that affects his behavior with other people, was unable to complete four[12] of the 16 tasks associated with an impairment that affects his ability to help himself and cooperate with others in taking care of personal needs, and was incapable of

---

[8] Master of Science with Certificate of Clinical Competence in Speech-Language Pathology.
[9] These tasks were delivering telephone messages, telling jokes or riddles accurately, and explaining why he did something.  (R. at 152).
[10] These tasks were writing in longhand (script), knowing the days of the week and months of the year, and telling time.  (R. at 153).
[11] These tasks were having friends his own age, being able to make new friends, and playing team sports (e.g., baseball, basketball, soccer).  (R. at 155).
[12] These tasks were hanging up clothes, helping around the house (e.g., washing or drying dishes, making bed(s), sweeping/vacuuming floor, raking or mowing yard, helping with laundry), obeying safety rules (for instance, looking for cars before crossing street), and accepting criticism or correction.  (R. at 156).

completing four[13] of the five tasks associated with limited ability to pay attention and stick with a task. (R. at 147-58).

- Medical records from Jackson Purchase Medical Center, where C.N.R. was treated at the ER on December 17, 2012, for flu. (R. at 260-84).

Based on the evidence, the evaluator, Jane Brake ("Dr. Brake"), Ph.D., determined that C.N.R. had less than marked limitations in Domains 1, 2, 3, and 5, and no limitation in Domains 4 and 6. (R. at 59-60). Dr. Brake concluded that C.N.R. therefore did not functionally meet the criteria for impairment, as his medically determinable impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal the listings. (R. at 60). Dr. Brake further explained, noting C.N.R.'s "mental limitations . . . are partially credible," that medication was prescribed for his ADHD, that Asperger's was alleged but not mentioned by Dr. Wiggins nor the teacher questionnaire, and that the teacher questionnaire showed C.N.R. had "some limitations but not markedly so." (R. at 60). Based on the documented findings, the assessment concluded C.N.R. was not disabled, and was signed by Dr. Brake and the disability adjudicator/examiner, Krista Lumpkins. (R. at 60-62).

The second of these assessments, from the reconsideration level, was based on evidence from the initial assessment, supplemented by the following additional evidence:

- A teacher questionnaire from September 25, 2013, based on the first seven weeks of C.N.R.'s new school year. (R. at 186-94). The questionnaire noted that C.N.R. was "below grade level" in all three areas questioned (reading, math, and written language), and that, using the same rating scale as the previous May 2013

---

[13] These tasks were keeping busy on his own, finishing things he starts, and working on arts and crafts projects (drawing, painting, knitting, doing woodwork, and completing chores most of the time). (R. at 157).

questionnaire, C.N.R. had an obvious problem in five[14] of ten sub-categories in Domain 1, and a slight problem in the remaining areas, an obvious problem in four[15] of thirteen sub-categories in Domain 2, and a slight or no problem in the remaining areas, an obvious problem in three[16] of thirteen sub-categories in Domain 3, and a slight or no problem in the remaining areas, and no problems in Domain 4 or 5.

- A request for administrative information, completed by Mayfield Elementary School on September 13, 2013, that reflected C.N.R.'s standardized assessment scores (23rd percentile in reading and 74th percentile in math, per his April 2012 K-PREP results),[17] educational disabilities ("Autism"), placement in Special Ed. Instruction Resource Room for 1.25 hrs./week and Speech-Language Therapy for 0.5 hrs./week, and that a reevaluation was then being completed on C.N.R. (R. at 336-38).

- A speech questionnaire from September 13, 2013, reflecting C.N.R.'s ongoing language therapy for moderate impairment with "receptive & expressive language" including "difficulties expressing his thoughts & ideas with peers and

---

[14] The obvious problems identified were reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving skills in class discussions. (R. at 188).

[15] The obvious problems were paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, and completing work accurately without careless mistakes. (R. at 189).

[16] The obvious problems were introducing and maintaining relevant and appropriate topics of conversation; interpreting meaning of facial expression, body language, hints, sarcasm; and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (R. at 190). This section also discussed the "reward system in place to keep [C.N.R.] focused and used as a re-directing tool." (R. at 190).

[17] The same results, quantified in numeric scores rather than performance range, as previously reported on the May 2013 request for administrative information.

adults," as well as results from a Clinical Evaluation of Language ("CELF") 4th Edition language test, given on September 12, 2013, with "good" reliability, that resulted in a Receptive Language Score of 92, an Expressive Language Score of 67, and a Total Language Score of 72. (R. at 333-35).

- A speech and language evaluation by Charlene Sheehan ("Sheehan"), M.S., CCC/SLP, through Kentucky's Department of Disability Determination. (R. at 326-330). Sheehan administered two forms of standardized tests. On the Goldman Fristoe Test of Articulation:2, to assess speech sound production in words and sentences, C.N.R. "obtained a standard score of 72, placing him in the second percentile when compared to same age peers. The results of this evaluation suggest a moderate to severe delay in articulation development." (R. at 328).

- The CELF 3rd Edition was administered to assess receptive and expressive language skills.[18] C.N.R. received a standard score of 78 in Receptive Language, placing him in the seventh percentile, a standard score of 57 in Expressive Language, placing him in the first percentile, and a Total Language score of 65, placing him in the first percentile compared to same age peers. (R. at 328-29). "These results suggest a severe language deficit in the ability to understand and use language effectively, but must be interpreted with caution due to [C.N.R.'s] lack of motivation and inappropriate behaviors. He demonstrated a short attention span and a lack of desire to understand the directions or put forth his best efforts

---

[18] The report notes that "[s]ix subtests receive standard scores based on ten with a standard deviation of three. A standard score in three subtests is obtained for receptive language, expressive language and a final total language score is determined." (R. at 328).

on the test. . . . [C.N.R.] was not on medication for his ADHD today and his performance may be a reflection of his disorder."  (R. at 329).

- Updated medical records from Dr. Wiggins, reflecting C.N.R.'s ongoing medication for his ADHD.  (R. at 323-25).

- Medical records from Jackson Purchase Medical Center, where C.N.R. was treated at the ER on April 24, 2013, for allergic rhinitis with a cough and sore throat.  (R. at 254-59).

- An unidentified additional piece of evidence, received on August 24, 2013, and given the Evidence Type code "5002 ROC."  The Court is unable to determine what evidence this references.  It does not appear to have been relied on, in any case, in the disability determination.

The assessment included the finding by a "Medical/Psych Consultant," Mary K. Thompson ("Dr. Thompson"), Ph.D., regarding C.N.R.'s behavior during Charlene Sheehan's evaluation, and noted that the recent teacher questionnaire "does not suggest that this is typical behavior" and therefore such behavior at the evaluation "should not be interpreted as typical given indication of less severity in the mental [evaluation] and in the school setting."  (R. at 69).

Based on the evidence, the evaluators, Dr. Thompson and Julie B. Jones, M.S./CCC-SLP, determined that C.N.R. had less than marked limitations in Domains 1, 2, 3, and 5, and no limitation in Domains 4 and 6.  (R. at 71-73).  Specific findings included domain-specific findings from the teacher and speech questionnaires in the record, and domain-specific discussions of C.N.R.'s standardized test scores.  (R. at 71-72).  They concluded that C.N.R. did not functionally equal the listing, as his medically determinable impairment or combination of impairments is severe, but did not meet, medically equal, or functionally equal the listings.  (R.

at 73). The same explanation as provided by Dr. Brake regarding the fact that C.N.R.'s "mental limitations . . . are partially credible," that medication was prescribed for his ADHD, that Asperger's was alleged but not mentioned by Dr. Wiggins nor the teacher questionnaire, that the teacher questionnaire showed C.N.R. had "some limitations but not markedly so," was included. (R. at 73). Based on the documented findings, the assessment therefore concluded C.N.R. was not disabled, and was signed by Dr. Thompson and the disability adjudicator/examiner, Henry Gardner. (R. at 74-76).

Plaintiff argues that the weight granted by the ALJ to assessments relying on an incomplete record "constitutes reversible error" under Sixth Circuit precedent. (Pl.'s Obj. 5 (citing *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646 (6th Cir. 2011))). Plaintiff argues that the assessments "do not constitute substantial evidence upon the record as a whole and the ALJ erred by affording them 'great weight.'" (Pl.'s Obj. 6 (citing *Johnson*, 652 F.3d 646; *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004))).[19]

The ALJ made findings throughout her decision that demonstrated reliance on the complete record, rather than the assessments alone, including school records from Mayfield Independent Schools from October 2013 that indicated C.N.R.'s "overall cognitive functioning as well as basic reading and math computation skills were noted to fall within the average range"

---

[19] The Court notes that the cases cited by Plaintiff are distinguishable from the case at bar. *Johnson*, *Blakley*, and *Wilson* stand for the principle that the Commissioner is obliged to follow his or her own regulations with respect to the weight to be given to treating physicians. *Johnson*, 652 F.3d at 651-52; *Blakley*, 581 F.3d at 406-07; *Wilson*, 378 F.3d at 545. These cases, however, arose in the context of applying the five-step inquiry for adult disability insurance benefits, which utilizes a different set of guidelines for weighing medical evidence than was applied to the assessments at issue here. *Compare* 20 C.F.R. § 404.1527(d), *with* 20 C.F.R. § 416.926a(e) (discussed below).

and "minimal symptoms of autism spectrum disorder," as well as the most recent teacher questionnaires, which were not in the record for either assessment. (R. at 19-26).

From the foregoing discussion, it is clear that the ALJ's decision was supported by abundant evidence that was anything but "woefully incomplete." Plaintiff's Objection will be overruled on this basis.

### 2. *Regulations for Addressing Test Scores*

Plaintiff further argues that the ALJ failed to follow the applicable regulations regarding C.N.R.'s objective test scores and their "inconsistencies" with other evidence in the record. (Pl.'s Obj. 5). "Rather, the ALJ simply ignored the objective test results, ignored the inconsistencies, and afforded 'great weight' to non-examining state agency psychological opinions of a person who did not see important evidence." (Pl.'s Obj. 5). Plaintiff additionally contends that "those non-examining opinions failed to adequately address even the evidence they did have available, including the test results from the consultative examiner ([report of] Dr. Amble [R. 308-14])." (Pl.'s Obj. 5).

The applicable regulation provides:

> The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a 'marked' or 'extreme' limitation in a domain.

20 C.F.R. § 416.926a(e)(1)(ii). The regulations specifically dictate how the Commissioner considers such test scores, and state that "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain," and that, when considered alongside other information, "including reports of classroom performance and the observations of school personnel and others," test scores within the "marked" or "extreme"

definitions may be outweighed by the overall evidence and result in a finding of no "marked" or "extreme" limitations, and vice versa. *Id.* § 416.926a(e)(4). The regulation also discusses the guidelines followed where "there is a material inconsistency between your test scores and other information in your case record," in which case the Commissioner will try to resolve it either with the information in the record or by obtaining additional information. *Id.* § 416.926a(e)(4)(iii). The regulation further provides:

> Generally, [the Commissioner] will not rely on a test score as a measurement of your functioning within a domain when the information we have about your functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of your day-to-day functioning. When we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision.

*Id.* § 416.926a(e)(4)(iii)(B).

The ALJ discussed the GAF scores in the record, and explained her reasons for affording them only limited weight in light of the "recent medical evidence as a whole," that C.N.R.'s ADHD had "generally responded well to medication" and "autistic symptoms have been characterized as minimal." (R. at 26). The ALJ further noted that the GAF ratings by Four Rivers Behavioral Health, while not typically denotive of a disabling level of limitation, could not be afforded significant weight due to the fact they did "not appear to have been endorsed by an acceptable source to give a medical opinion." (R. at 26). The ALJ therefore complied with Section 416.926a(e)(1) and (e)(4), and her decision was "supported by substantial evidence and was made pursuant to proper legal standards." *Rogers*, 486 F.3d at 241 (citations omitted). The Court is therefore obliged to affirm, as it is not its function upon review to second-guess the factfinder with respect to conflicts of evidence or questions of credibility. *Bass*, 499 F.3d at 509 (citation omitted); *Siterlet*, 823 F.2d at 920 (citation omitted).

**B.      ALJ's Conclusions of Fact**

Plaintiff makes a general objection that the ALJ's conclusions were not supported by substantial evidence.  In addition, Plaintiff specifically argues that the ALJ should have called upon a medical expert for updated medical opinions in light of the additional evidence entered into the administrative record after the two assessments, failed to follow the applicable regulations in her decision, and ignored Plaintiff's testimony at the administrative hearing.  (Pl.'s Obj. 6-8).  Plaintiff specifically addresses evidence that she argues demonstrates an extreme impairment in Domain 3, at least markedly impaired in Domain 5, markedly impaired in Domain 1, and at least markedly impaired in Domain 2.  (Pl.'s Obj. 8-17).

As Magistrate Judge King noted, Plaintiff's testimony at the hearing, as the testimony of a lay witness, would have been "entitled to perceptible weight only if . . . fully supported by the reports of the treating physicians."  *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983)). Magistrate Judge King found that, while no treating physician offered an opinion of C.N.R.'s limitations, Plaintiff's testimony, "even if fully credited, was not so alarming as to require the ALJ to find C.N.R. disabled.  The ALJ did not err in finding the mother's testimony to be only partially (not fully) credible."  (R. & R. 6).  The Court agrees.

As discussed above, the ALJ demonstrated reliance upon the record as a whole when making her decision, rather than the narrower record available at the time of the state agency assessments, including the records Plaintiff references at pages 228-37, 238-47, and 378-99 of the Administrative Record.  (Pl.'s Obj. 6-17).  Furthermore, the records Plaintiff references at pages 341-77 and 400-410 of the Administrative Record were outdated by the time of the initial assessment and at best provided context to the updated records of comparable information.  (Pl.'s

Obj. 6). Finally, as previously noted, the ALJ adequately explained her decision in light of the test scores in the record, and fulfilled the Commissioner's requirements for doing so. (R. at 19-26). Again, the ALJ's decision was supported by substantial evidence, pursuant to proper legal standards, and the Court will not second-guess her position as factfinder. *Rogers*, 486 F.3d at 241 (citations omitted); *Bass*, 499 F.3d at 509 (citation omitted); *Siterlet*, 823 F.2d at 920 (citation omitted).

## C. Required Legal Standards

Finally, Plaintiff reiterates her previous objection that the ALJ failed to follow the Commissioner's protocol for evaluating the evidence in the record, alleges that the ALJ "intentionally selectively ignored" test results that Plaintiff contends demonstrate C.N.R.'s disability, and contends that Magistrate Judge King "succumbed to the erroneous approach of perusing the record for evidence tending to support the administrative fact findings." (Pl.'s Obj. 18-21). In doing so, Plaintiff mischaracterizes the standard of review: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, *shall be conclusive* . . . ." 42 U.S.C. § 405(g) (emphasis added). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (citation omitted). While Plaintiff is not persuaded that the ALJ's determination was correct, the Court agrees with Magistrate Judge King that the decision is supported by substantial evidence in the record, including but not limited to teacher and speech questionnaires, a low normal IQ score of 94, effective treatment of the claimant's ADHD with medication, and good prognosis in ongoing school speech/language therapy.

## V.    <u>CONCLUSION</u>

For the reasons discussed above, **IT IS HEREBY ORDERED** as follows:

1.      Plaintiff's Objection to the Magistrate Judge's Findings of Fact, Conclusions of Law, and Recommendation (DN 25) is **OVERRULED**;

2.      Magistrate Judge King's Findings of Fact, Conclusions of Law, and Recommendation (DN 22) are **ADOPTED** to the extent not inconsistent with this opinion; and

3.      Plaintiff's Complaint (DN 1) is **DISMISSED WITH PREJUDICE**.

**Greg N. Stivers, Judge**
**United States District Court**

October 23, 2017

cc:     counsel of record